In re Jennifer L. **PRUITT**, Debtor.

No. 08–30164 (ASD).

United States Bankruptcy Court, D. Connecticut.

Feb. 24, 2009.

Kenneth E. Lenz, The Lenz Law Firm, Orange, CT, for Debtor.

**MEMORANDUM OF DECISION ON OBJECTION TO CONFIRMATION OF CHAPTER 13 PLAN**

ALBERT S. DABROWSKI, Chief Judge.

## I. INTRODUCTION

The Debtor's Chapter 13 Plan is before the Court for confirmation. That plan (the

"Debtor's Plan") proposes, *inter alia*, to surrender a certain motor vehicle to its purchase-money lender in full satisfaction of the claims of that lender. Due to this provision, the Debtor's Plan was met with strenuous objection from the lender. The resulting dispute raises legal issues precipitated by the so-called "hanging paragraph" of United States Bankruptcy Code Section 1325(a). Those issues have divided a growing number of courts. For the reasons that follow, this Court allies itself with those courts that have found a full-satisfaction vehicle surrender to be an appropriate element of a Chapter 13 plan. Accordingly, the Debtor's Plan will be confirmed.

## II. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant matter by virtue of 28 U.S.C. § 1334(b). This Court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1), and the District Court's General Order of Reference dated September 21, 1984. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(L).

## III. FACTUAL BACKGROUND

A. On January 18, 2008 (the "Petition Date"), Jennifer L. Pruitt (the "Debtor") commenced this Chapter 13 bankruptcy case through the filing of a petition in this Court. On that same day the Debtor filed all required Statements and Schedules, as well as the proposed Debtor's Plan.

B. The Debtor's Schedule B—"Personal Property"—lists a 2003 Mitsubishi Eclipse automobile (the "Vehicle"), to which the Debtor assigned a value of $10,690.00.

C. The Vehicle was purchased by the Debtor from County Line Mitsubishi in Middlebury, Connecticut, pursuant to a *Retail Installment Contract and Security Agreement* ("Loan & Security Agreement") on September 15, 2007. Under the terms of the Loan & Security Agreement, the Debtor financed a total of $18,029.82. Also on September 15, 2007, County Line Mitsubishi assigned its rights in the Loan & Security Agreement to TD Banknorth, N.A. ("Banknorth").

D. On her Schedule D—"Creditors Holding Secured Claims"—the Debtor lists Banknorth as holding a claim secured by the Vehicle. That claim is stated in the gross amount of $15,761.00, of which $5,071.00 is scheduled as an "unsecured portion".

E. The Debtor's Plan proposes, *inter alia*, that (i) the Debtor will make monthly payments to the Chapter 13 Trustee in the amount $150.00 for a period of 36 months; (ii) creditors holding unsecured claims will be paid not less than 26% of the allowed amount of such claims; and (iii) with respect to the claim of Banknorth, the Debtor "is to surrender [the Vehicle] in full satisfaction of any claim by said creditor."

F. On January 23, 2008, Banknorth filed a Proof of Claim (Proof of Claim No. 1) (the "Proof"). In Box No. 1 of the Proof, Banknorth stated the gross amount of its claim as $15,833.02, as of the Petition Date. In Box No. 4 of the Proof, Banknorth noted that its claim was secured by a lien on the Vehicle, which it claimed had a value of $8,400.00. Nonetheless, Banknorth stated that the entire amount of its Claim was secured, and left empty the line reserved for "Amount Unsecured".

G. On January 29, 2008, Banknorth objected to confirmation of the Debtor's Plan on the basis of the proposed treatment of its claim (Doc. I.D. No. 20).

H. Also on January 29, 2008, Banknorth filed a motion pursuant to Bankrupt-

cy Code Section 362(d) seeking relief from the automatic stay of Section 362(a) (Doc. I.D. No. 18) (hereafter, the "Stay Relief Motion") to enable it to obtain possession and dispose of the Vehicle. Among the grounds stated by Banknorth for relief from stay was the Debtor's expressed intention to surrender the Vehicle. The Debtor did not oppose the Stay Relief Motion, and by order dated March 5, 2008 (Doc. I.D. No. 25) this Court granted relief from the automatic stay to Banknorth "for the purposes of allowing [it] . . . to exercise its rights to satisfy its lien in accordance with the [Loan & Security Agreement]".

I. On April 10, 2008, this Court held a hearing on confirmation of the Debtor's Plan (the "Hearing") and agreed to take the matter "on the papers" after April 21, 2008.[1]

## IV. DISCUSSION

### A. Background of the Question at Bar.

This contested matter presents the question of whether a Chapter 13 debtor may confirm a bankruptcy plan that proposes to surrender a motor vehicle that collateralizes a "purchase money" debt that arose within the 910 days preceding the filing of the debtor's bankruptcy petition (a "910–Vehicle Claim") *in full satisfaction of the entire 910–Vehicle Claim,* despite the fact that the amount of the 910–Vehicle Claim exceeds the value of the subject vehicle? In this case it is undisputed (i) that Banknorth's claim is a 910–Vehicle Claim; (ii) that Banknorth's

910–Vehicle Claim exceeds the value of the Vehicle; and (iii) that the Debtor has the right to treat Banknorth's allowed *secured* claim by surrendering the Vehicle through the Debtor's Plan. The contest in this matter, however, is over the narrow question of whether the Debtor's Plan must also provide treatment of any unsecured "deficiency" claim that Banknorth might possess by virtue of applicable non-bankruptcy law (hereafter, "State Law"),[2] or whether surrender alone suffices to satisfy Banknorth's *entire* claim under federal bankruptcy law.

Resolution of this question turns largely on one's interpretation of the effect of the so-called "hanging paragraph" of Code Section 1325(a) (hereafter, the "Hanging Paragraph")—designated by some legal authorities as Subsection 1325(a)(*)[3]—which was engrafted into the Bankruptcy Code by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). There appears to be general agreement among judicial authorities that the Hanging Paragraph constitutes a poor example of legislative draftsmanship, *see, e.g., AmeriCredit Fin. Services, Inc. v. Long (In re Long),* 519 F.3d 288, 292–93 (6th Cir.2008); *In re Carver,* 338 B.R. 521, 523 (Bankr.S.D.Ga.2006), and courts have reached differing conclusions concerning the effect of that provision on Chapter 13 plans that propose to *surrender* a vehicle that is the subject of a 910–Vehicle Claim (hereafter, a "910–Vehicle"). The early majority view among bankruptcy courts was that the Hanging Paragraph enabled confirmation of a Chapter 13 plan that

---

1. After the Hearing, on April 22, 2008, Wachovia Dealer Services Inc f/k/a WFS Financial, Inc. filed an *Objection* to Chapter 13 Plan (Doc. I.D. No. 37). This objection was withdrawn on October 21, 2008 by Doc. I.D. No 44.

2. This term of art is utilized because of the fact that in rare instances non-bankruptcy *federal* law operates in the same manner as state law in the context of bankruptcy cases.

3. This designation results from the fact that the Hanging Paragraph is distinct, yet unnumbered.

included a *full-satisfaction surrender* of a 910–Vehicle, *i.e.* they held that an under-collateralized 910–Vehicle Claimant's *entire* claim could be fully satisfied by vehicle surrender under Code Section 1325(a)(5)(C), and thus the creditor was not entitled to separate treatment of an unsecured "deficiency" claim that arguably might otherwise be available through the operation of Code Section 506 or State Law. *See, e.g., In re Pinti,* 363 B.R. 369 (Bankr.S.D.N.Y.2007); *In re Moon,* 359 B.R. 329, 333 (Bankr.N.D.Ala.2007); *In re Ezell,* 338 B.R. 330 (Bankr.E.D.Tenn.2006) (collectively, the "Full Satisfaction Courts"). Conversely, a growing number of courts, including nearly all of the Circuit Courts of Appeal yet to address the issue, have held that an under collateralized 910–Vehicle Claimant is entitled to plan treatment of an unsecured "deficiency" claim determined under State Law, despite the debtor's surrender of a 910–Vehicle. *See, e.g., Tidewater Fin. Co. v. Kenney (In re Kenney),* 531 F.3d 312 (4th Cir.2008); *In re Ballard,* 526 F.3d 634 (10th Cir.2008); *Capital One Auto Fin. v. Osborn (In re Osborn),* 515 F.3d 817 (8th Cir.2008); *In re Wright,* 492 F.3d 829 (7th Cir.2007); *cf. Long, supra* (holding that upon surrender, a 910–Vehicle Claimant is entitled to treatment of an unsecured deficiency claim determined under *bankruptcy law,* rather than State Law) (collectively, the "Deficiency Courts").

This Court, having fully considered the opinions of both the Full Satisfaction and Deficiency Courts, and having undertaken an independent analysis of the import of the Hanging Paragraph, determines, *inter alia,* that a Full Satisfaction construction of Section 1325(a)(5) and (a)(*), although not without difficulty, is more consistent with constitutional tenets of federal legislative jurisdiction and the overall structure and purposes of the Nation's bankruptcy system; whereas, the Deficiency Courts' approach fails to give proper regard to the primacy of federal law and the plenary nature of federal bankruptcy law over the characterization of claims for the purposes of Chapter 13 bankruptcy cases.

### B. General Claims Jurisprudence under the Bankruptcy Code.

In order for this Court's opinion to be fully appreciated, it must be understood in the larger context of the federal bankruptcy law's general design for the *allowance* and *characterization* of secured and unsecured claims in bankruptcy cases, with particular emphasis upon the proper relationship between bankruptcy law and State Law in those determinations.

### 1. The authority of Congress under the Bankruptcy Clause.

The Bankruptcy Clause of the United States Constitution provides Congress with authority to establish *"uniform Laws on the subject of Bankruptcies throughout the United States."* U.S. Const., art. I, § 8, cl. 4 (emphasis supplied). From the earliest constructions of the Bankruptcy Clause, the power of Congress thereunder was seen as "unlimited and supreme". *Sturges v. Crowninshield,* 4 Wheat. 122, 17 U.S. 122, 192, 4 L.Ed. 529 (1819). While "unlimited" may overstate the force of the Bankruptcy Clause in relation to other constitutional constraints, *see, e.g.,* U.S. Const., Art. I, § 9, cl. 3 ("No ... ex post facto Law shall be passed."); Amend. V ("No person shall be ... deprived of ... property without due process of law ...."), what has been consistently recognized is the fact that there is no limit to the supremacy of national bankruptcy law in the areas where Congress has chosen to legislate. That is to say that to the extent that Congress has elected to enter the subject areas of bankruptcy, state laws

are preempted and displaced. *See Sturges,* 17 U.S. at 196, 4 Wheat. 122.

Over time federal bankruptcy legislation has become increasingly comprehensive, and thus, increasingly preemptive. As a result, and as discussed at greater length below, it is now fair to say that the application of state law in the entire field of debtor-creditor relations has been presumptively displaced by national bankruptcy law in the context of cases commenced under Title 11 of the United States Code. In other words, once a bankruptcy case is commenced, the rules that govern the determination of rights and obligations *for purposes of the Title 11 case* are, at the prerogative of congress, supplied exclusively by federal bankruptcy principles. This important conclusion is confirmed by jurisprudence that has grown up around the Supremacy Clause, U.S. Const., art. VI, cl. 2.

Preemption of state law under the Supremacy Clause is fundamentally a question of congressional intent. *E.g., English v. General Elec. Co.,* 496 U.S. 72, 78–79, 110 S.Ct. 2270, 2275, 110 L.Ed.2d 65 (1990). Evidence of the fact and extent of preemption can take different forms. For instance, Congress can expressly state in statutory language the extent to which its enactments preempt state law. *See, e.g., id.* ("when Congress has made its intent known through *explicit* statutory language, the courts' task is an easy one" (emphasis supplied)). In the absence of explicit preemption, state law is preempted when it *actually conflicts* with federal law, e.g., "where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *E.g., id. (quoting Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). Finally, even if there is no direct conflict between the state and federal legal schemes, the state

scheme is preempted "where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a 'scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' or where an Act of Congress 'touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *Id. (quoting Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). This latter form of preemption is often referred to as "field preemption", or it is sometimes stated that federal interests, as evidenced by Congressional legislation, so "occupy the field" of a given subject that preemption of state law is manifest.

In light of the foregoing, and as illustrated by the discussion below, it is patent that, at a minimum, Congress has fully "occupied the field" of debtor-creditor relations in bankruptcy, and that, as such, preemption of state law concepts within bankruptcy cases is now comprehensive. As the Ninth Circuit Court of Appeals has insightfully observed—

[A] mere browse through the complex, detailed, and comprehensive provisions of the lengthy Bankruptcy Code ... demonstrates Congress's intent to create a *whole system under federal control* which is designed to bring together and adjust all of the rights and duties of creditors and embarrassed debtors alike. While it is true that bankruptcy law makes reference to state law at many points, *the adjustment of rights and duties within the bankruptcy process itself is uniquely and exclusively federal.*

*MSR Exploration, Ltd. v. Meridian Oil, Inc.,* 74 F.3d 910, 914 (9th Cir.1996) (em-

phasis supplied; footnote omitted). The "dominant" federal interest that precipitates field preemption in the bankruptcy arena is nothing less than the primary constitutional imperative under the Bankruptcy Clause—uniformity. Indeed, "[t]he national purpose to establish uniformity necessarily excludes state regulation." *International Shoe Co. v. Pinkus,* 278 U.S. 261, 265, 49 S.Ct. 108, 110, 73 L.Ed. 318 (1929); *accord Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 918 n. 9, 59 L.Ed.2d 136 (1979) (it is "settled . . . that state laws *to the extent that they conflict with the laws of Congress,* enacted under its constitutional authority, on the subject of bankruptcies are suspended." (emphasis supplied)); *Sturges,* 17 U.S. at 193–94, 4 Wheat. 122 ("Congress is not authorized merely to pass laws, the operation of which shall be uniform, but to establish uniform laws on the subject throughout the United States. This establishment of uniformity is, perhaps, incompatible with state legislation. . . ."). Moreover, "[s]tates may not . . . interfere with or *complement* the Bankruptcy Act or . . . provide additional or *auxiliary* regulations." *International Shoe,* 49 S.Ct. at 110 (emphasis supplied).

This is not to say that State Law has no permissible role to play in the conduct of bankruptcy cases. Indeed, State Law plays important definitional and referential roles under Title 11. State Law's primary function under Title 11 is to define the *pre-existing, i.e.* pre-bankruptcy, rights of the parties to a bankruptcy case. This function is important, in that it establishes a baseline of rights and obligations that Congress can then modify, as necessary, so as to produce a set of *bankruptcy* rights and obligations for purposes of treatment and participation in the bankruptcy case itself. Prototypical of these principles is the rela-

tionship between bankruptcy law and State property law in the creation of a bankruptcy estate. A debtor's estate pre-bankruptcy and post-bankruptcy are entirely different animals; the former being determined by State Law and the latter being the exclusive province of federal bankruptcy law. The essential relationship between the two bodies of law in this context is that Congress chose to construct the supreme federal bankruptcy law concept of a debtor's *bankruptcy estate* upon a base of a debtor's pre-existing State Law property rights. Thus, under Bankruptcy and Supremacy Clause jurisprudence, State Law provides nothing more than a *"starting point"* within Congress' design of the federal concept of a bankruptcy estate. More specifically, Bankruptcy Code Section 541 sets out the parameters of the debtor's estate in bankruptcy. The base upon which that estate is constructed is subsection 541(a)(1)—"all legal or equitable interests of the debtor in property as of the commencement of the [bankruptcy] case." Assessment of this conceptual base compels inquiry into the nature and extent of the debtor's property holdings immediately pre-bankruptcy and thus, *necessarily* references State Law. *See, e.g., Butner,* 99 S.Ct at 918 ("Property interests are created and defined by state law." (emphasis supplied)). From this base, however, Congress, in the exercise of its plenary bankruptcy jurisdiction, has gone on to modify the pre-bankruptcy estate—by adding to,[4] and subtracting from,[5] the pre-bankruptcy base estate—so as to construct a *bankruptcy* estate that is compatible with the broad scheme of bankruptcy administration and other important federal interests, such as uniformity.

■ The coordination between State Law and federal bankruptcy law that is

---

**4.** *See e.g.,* 11 U.S.C. § 541(a)(5) (2008).

**5.** *See e.g.,* 11 U.S.C. § 541(b) (2008).

demonstrated in Congress' design of Section 541 is illustrative of the constitutional paradigm that is operative in all areas of a federally occupied field, such as bankruptcy. Namely, the use of State Law is wholly at the prerogative of Congress, subject only to any Constitutional provision that might otherwise constrain Congress. No such constitutional concerns are implicated here. Indeed, it is noteworthy that the Supreme Court has observed that *"Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law"*, *id.* at 918 (emphasis supplied), not that the *Constitution* has left the determination of property rights to state law. Simply stated, State Law is only operative in bankruptcy to the extent that Congress has permitted it.

Congress' prerogative to utilize State Law in the field of bankruptcy law has been exercised and expressed in at least two different forms. First, as illustrated in the foregoing discussion of estate creation, Congress has consciously utilized State Law to define pre-existing, *i.e. pre*-bankruptcy, concepts such as a debtor's "interest in property", *see* Section 541(a)(1), or the "enforceability" of a creditor's claim, *see* Section 502(b)(1). Second, Congress has also expressly permitted parties to elect to have certain post-petition rights and obligations governed by State Law rules. For instance, in the area of bankruptcy property exemptions, despite Congress' creation of a standard set of *bankruptcy* exemptions, 11 U.S.C. § 522(d) (2008), Code Section 522 *expressly* permits debtors to choose either (i) the bankruptcy exemption scheme or (ii) non-bankruptcy property exemption schemes available under State Law. *See* 11 U.S.C. § 522(b)(1) (2008). Section 522 also permits individual States to opt their citizens out of the bankruptcy exemption scheme entirely. *See* 11 U.S.C. § 522(b)(2) (2008).[6]

Each of these methodologies, though, are species of the very same paradigm—that State Law has a role to play in bankruptcy only if Congress affirmatively permits it. In other words, once a bankruptcy case is commenced, there is allowance for the operation of State Law *only to the extent that Congress provides for its viability.*

## 2. Plenary federal jurisdiction over bankruptcy claim determinations.

 The principles of "field preemption" and the expedient exercise of Congress' prerogative over the use of State law are no more plainly evidenced than in the subject area of the instant matter, *i.e.* within the realm of bankruptcy claim determinations. The pre-existing "claim", *i.e.* the "right to payment", *see* 11 U.S.C. § 101(5), that a creditor brings to a bankruptcy case necessarily has its *origins* in State Law. *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20, 120 S.Ct. 1951, 147 L.Ed.2d 13 (2000) ("[c]reditors' entitlements in bankruptcy arise *in the first Instance* from the underlying substantive law creating the debtor's obligation." (emphasis supplied)). However, once a bankruptcy case is commenced, the supreme federal law of bankruptcy claim determination preempts and overrides State Law in the

---

**6.** Exemptions from the property of a bankruptcy estate are allowed a debtor for the purpose of preserving a core "bundle" of property to enable a desired level of subsistence and facilitate the debtor's "fresh start". Despite plenary federal jurisdiction over this area of bankruptcy practice, Congress' allowance of alternative State Law exemptions makes the availability of particular exemptions in bankruptcy cases across the nation anything but "uniform". For instance, a Florida debtor may exempt a one-half acre urban homestead of *unlimited* value, while a Missouri debtor may exempt only $15,000 from the value of his homestead.

service of the *federal* legislative objectives exercised under Bankruptcy Clause. Specifically, the ultimate amount, character and class of a creditor's claim *for purposes of treatment in the bankruptcy case* is determined *solely* by the rules and principles of the federal bankruptcy law. *See, e.g., Long,* 519 F.3d. at 296–97.

Congress' occupation of the field of bankruptcy claim determination is evidenced by, *inter alia,* the encompassing nature of sub-chapter I of Chapter 5 of Title 11 of the United States Code. Chapter 5 (titled *"Creditors, the Debtor, and the Estate "*) is applicable to Chapter 13 cases, *inter alia.* 11 U.S.C. § 103(a) (2008). Subchapter I of Chapter 5 (titled *"Creditors and Claims "*) houses Sections 501–511 of the Code. These provisions, *inter alia,* comprise the plenary federal law determining the allowance, characterization and classification of the claims of creditors in all bankruptcy cases.[7] The constituent Chapter 5 sections with direct relevance to the matter at bar are Sections 502 and 506.

### a. *Allowance* of claims—Section 502.

Section 502—titled *"Allowance of claims or interests"*—governs general claim "allowance"—*i.e.* a determination of the gross monetary amount of the obligation of the debtor to the creditor to be *recognized in bankruptcy,* without regard to that claim's *characterization (i.e.* secured or unsecured nature), *classification (i.e.* distributional priority),[8] or *treatment,* in a debtor's plan or otherwise. Simply put, the "allowance"

question asks: what is the maximum *dollar amount* of a creditor's claim that the Bankruptcy Code will recognize for the purpose of a pending bankruptcy case?

Section 502 sets out the parameters and mechanics of bankruptcy claim allowance in specific terms as follows—

(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects.

(b) . . . if such objection to a claim is made, the court, after notice and a hearing, *shall determine the amount of such claim* in lawful currency of the United States *as of the date of the filing of the petition,* and shall *allow* such claim in such amount, *except to the extent that*—

(1) such claim is *unenforceable against the debtor and property of the debtor, under any agreement or applicable law* for a reason other than because such claim is contingent or unmatured;

(2) such claim is for unmatured interest;

(3) if such claim is for a tax assessed against property of the estate, such claim exceeds the value of the interest of the estate in such property;

(4) if such claim is for services of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services;

(5) such claim is for a debt that is unmatured on the date of the filing of

---

7. Representative sections of Chapter 5 include:
 Section 501—"Filing of proofs of claims or interests"
 Section 502—"Allowance of claims or interests"
 Section 503—"Allowance of administrative expenses"
 Section 505—"Determination of tax liability"

Section 506—"Determination of secured status"
Section 507—"Priorities"
Section 510—"Subordination"

8. No distributional priority issues are raised in the instant contested matter. Hence, this Memorandum of Decision will not further discuss the Bankruptcy Code's classification scheme under Section 507.

the petition and that is excepted from discharge under section 523(a)(5) of this title;

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates;

(7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds—

(A) the compensation provided by such contract, without acceleration, for one year following the earlier of—

(i) the date of the filing of the petition; or

(ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus

(B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates;

(8) such claim results from a reduction, due to late payment, in the amount of an otherwise applicable credit available to the debtor in connection with an employment tax on wages, salaries, or commissions earned from the debtor; or

(9) proof of such claim is not timely filed. . . .

\* \* \* \*

11 U.S.C. § 502 (2008) (emphasis supplied).

What is most critical for present purposes is not an understanding of any of the specific claim allowance rules enumerated within Section 502(b), but rather an appreciation of the fact that *Section 502 stands in ultimate derogation of State Law.* Because Title 11 is plenary and supreme, some claims that are potentially enforceable under State Law are nonetheless disallowed in a bankruptcy case, and *visa versa,* in the service of federal bankruptcy interests.

▮ Congress has exercised its prerogative over State Law in the area of claims allowance with a nearly identical model of coordination as that utilized for estate creation and determination in Section 541. The interplay that is codified in Section 502, between supreme federal bankruptcy law and subordinate State Law, has been expounded by the United States Supreme Court. In *Raleigh,* the High Court confirmed the important, but ultimately subordinate, role of State Law in claims allowance by noting that "creditors' entitlements *in bankruptcy arise in the first instance* from the underlying substantive law creating the debtor's obligation, *subject to any qualifying or contrary provisions of the Bankruptcy Code.*" 530 U.S. at 20, 120 S.Ct. at 1955 (emphasis supplied). More recently the Supreme Court observed that "we *generally* presume that claims enforceable under applicable state law will be *allowed* in bankruptcy *unless they are expressly disallowed.*" *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.,* 549 U.S. 443, 127 S.Ct. 1199, 1206, 167 L.Ed.2d 178 (2007) (emphasis supplied). Thus, Congress has utilized State

Law claim concepts as an expedient base upon which to build its national bankruptcy law of claim determination. More often than not Section 502 produces an *allowed bankruptcy claim* that replicates the precise extent of the liability that would result under State Law. This is so because Subsection 502(b)(1)—which disallows a claim that is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law"—affirmatively incorporates State Law for a description of enforceable pre-existing obligations. Despite this State Law foundation, because Congress has determined that not all State Law outcomes are desirable in the context of bankruptcy cases, in some instances Section 502 requires claim disallowance, in whole or part, on grounds not generally found in State Law,[9] while in other instances it acts to allow certain claims that may otherwise be unenforceable under State Law.[10] Simply put, *in bankruptcy cases* Section 502 sometimes allows a larger claim, and sometimes smaller claim, than would be recognized under State Law in a non-bankruptcy forum.

### b. *Characterization of claims—e.g., Section 506.*

 Once the *amount* of a bankruptcy claim has been determined through *allowance*, the allowed claim must then be *characterized*. Specifically, if a creditor holding an allowable bankruptcy claim asserts that property of the bankruptcy estate stands as collateral for that claim, there must be a determination of the extent to which the allowed claim is indeed "secured" *for purposes of the bankruptcy case*. This process of bankruptcy claim characterization is wholly federal, and is generally[11] accomplished through the mechanism of Bankruptcy Code Section 506.

Section 506(a)—titled *"Determination of secured status "*—serves its characterization function through utilization of the unique bankruptcy methodology of claim *bifurcation*—the separation of an allegedly collateralized claim into two component parts: (i) a *secured* claim—reflecting the "value" of the creditor's bankruptcy estate collateral and/or (ii) an *unsecured* claim—reflecting the residual debt, or "deficiency", after accounting for such collateral, to wit:

An allowed claim of a creditor secured by a lien[[12]] on property in which the estate has an interest ... is a *secured claim* to the extent of the value of such creditor's interest in the estate's interest in such property ... and is an *unse-*

---

9. *See, e.g.,* Section 502(b)(4), (claims of insiders or attorneys of the debtor); Section 502(b)(6) (claims of landlords under terminated leases); and Section 502(b)(7) (claims of employees under terminated employment contracts)—each of which imposes a monetary cap not necessarily found under State Law.

10. *See, e.g.,* Section 502(b)(1) (disallowing a claim that is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law *for a reason other than because such claim is contingent or unmatured ....*") (emphasis supplied).

11. Under rare circumstances claim characterization is determined by the dictates of Title 11 provisions other than Section 506. *See, e.g.,* 11 U.S.C. § 1111(b) (2008) (allowing a class of Chapter 11 secured creditors to elect to have their allowed claims treated as fully secured). And of course the matter at bar highlights another area where Congress has chosen to characterize claims in a manner inconsistent with Section 506.

12. A "lien" under the Bankruptcy Code includes any "charge against or interest in property to secure payment of a debt or performance of an obligation." 11 U.S.C. § 101(37) (2008).

*cured claim* to the extent that the value of such creditor's interest ... is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest. 11 U.S.C. § 506(a)(1) (2008) (emphasis supplied).

Since Section 506 is a constituent part of the statutory scheme of Subchapter I of Chapter 5, it should not be surprising that it operates with the same general model of State Law/bankruptcy law coordination as is embodied in Section 502. That is to say that Section 506, as part and parcel of a "field" wholly "occupied" by federal law, plays the same plenary federal role for purposes of claim *characterization* as Section 502 does for claim *allowance*. Section 506, like Section 502, acts in specific derogation of State Law.[13] Just as Section 502

supplies the supreme federal law for claim *allowance* in bankruptcy, so too does Section 506 stand as the primary expression of Title 11's exclusive and plenary jurisdiction over bankruptcy claim *characterization*.[14]

Section 506's preemption of State Law claim characterization concepts is most apparent in its conception of "value". In a manner that is unique to bankruptcy jurisprudence, Section 506's measure of the "value" of a secured creditor's interest in collateral—and consequently, the amount of its secured claim and any unsecured "deficiency" claim—is generally[15] determined circumstantially by reference to the collateral's "proposed disposition or use". For instance, *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997), reads Section 506(a)(1) to dictate that "replacement value"[16] be utilized when collateral is proposed by a debtor to be "used", *e.g., retained* by her through the bankruptcy process.[17] Nota-

---

**13.** Evidence of federal bankruptcy law's predominance in this area can be seen within the structure of Section 506 itself. Namely, subsection 506(b) provides, in the case of an *over-secured* claim, for the inclusion of post-petition interest and any reasonable fees, costs, or charges *provided for under the agreement or State statute under which such claim arose.* (emphasis supplied). The fact that Congress deemed it necessary to make *explicit* this limited area where it intended to permit State Law concepts to have effect confirms Congressional intent that in the claim characterization context State Law is to be utilized only when expressly·licensed.

**14.** If anything, Section 506 indicates that Congress intended Title 11's preemption of State Law concepts to be even more pervasive in the area of claim characterization than in the context of claim *allowance.* Section 506(a) is written in absolute terms. Unlike the structure of Section 502(b), it does not generally endorse State Law outcomes and then enumerate specific exceptions. Instead, by its terms, its unique federal bifurcation rules admit of no exceptions and confirm federal

bankruptcy law's occupancy of the entire field of claim characterization.

**15.** *See* fn. 17.

**16.** As used by *Rash*, "replacement value" is "what the debtor would have to pay for comparable property". 520 U.S. at 955, 117 S.Ct. at 1882.

**17.** The BAPCPA amended Section 506(a) to require use of "replacement value" even in instances in which collateral is proposed by a debtor to be "disposed of", *e.g.*, surrendered, in the bankruptcy process. That amendment, codified as subsection (2) of Section 506(a), provides that—

If the debtor is an *individual* in a case under *chapter 7 or 13*, such value with respect to *personal property* securing an allowed claim shall be determined based on the *replacement value* of such property as of he date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a

bly, the use of "replacement value", as such, for the characterization of claims is rarely encountered outside the bankruptcy forum because the collateral's use or retention is rarely, if ever, the context in which "deficiency" claims are determined under State Law. The predominant valuation concept under State Law is what *Rash* refers to as "foreclosure value".[18]

■ Again, as with claim *allowance*, what is of critical importance for present purposes is not the specific outcome that Section 506, or other federal bankruptcy claim *characterization* scheme,[19] may produce for a given claim in a given bankruptcy case but, rather, the fundamental principle that for purposes of treatment in bankruptcy cases Congress intended that State Law deficiency claim concepts be wholly displaced by the plenary *bankruptcy* law standards of claim *characterization*. Just as Section 502 is the embodiment of Title 11's occupation of the field of bankruptcy claim allowance, so too does Section 506 constitute Congress' primary expression of federal bankruptcy law's plenary authority in the area of claim characterization. Given plenary federal bankruptcy claim characterization authority, there is no basis for a party-in-interest to assert that State Law deficiency methodologies are controlling in any context.[20]

### C. Chapter 13 Plan Confirmation— Permissible *Treatment* of Claims.

Having surveyed the permissible role of State Law in the area of bankruptcy claims' determination, it is appropriate now to turn to the specific context of the dispute before the Court—the confirmation of a debtor's Chapter 13 plan. Once a creditor's claim has been *allowed* and *characterized* under federal bankruptcy law, a court is then prepared to assess a Chapter 13 plan's proposed *treatment* of the resulting "allowed *secured* claim" and/or "allowed *unsecured* claim".

Code Section 1325 specifies the conditions, including claim treatment options, under which a debtor's Chapter 13 plan may be confirmed. The only confirmation conditions implicated in the matter at bar relate to the Debtor's Plan's proposed treatment of secured and unsecured claims.

#### 1. Allowed *unsecured* claims.

As to an "allowed *unsecured* claim"— including a deemed unsecured "deficiency" claim under Section 506(a)—Section 1325(a)(4) provides as follows:

(a) Except as provided in subsection (b), the court shall confirm a plan if-

\* \* \* \*

(4) the value, as of the effective date of the plan, of property to be

---

retail merchant would charge for property of that kind *considering the age and condition of the property at the time value is determined.*
11 U.S.C. § 506(a)(2) (2008) (emphasis supplied).

18. As used by *Rash,* "foreclosure value" is "what the secured creditor would obtain through foreclosure sale of the property". *Id.*

19. *See* fn. 11.

20. When Congress intends to provide bankruptcy parties with access to a State Law alternative to a Title 11 bankruptcy scheme, it

does so carefully and explicitly. For example, as explained *supra,* Code Section 522 permits debtors to choose between bankruptcy and State Law property exemption schemes, *see* 11 U.S.C. § 522(b)(1) (2008) (permitting individual debtors to select either a bankruptcy exemption scheme (*see* Sections 522(b)(2) and (d)) or a State Law exemption scheme (*see* Section 522(b)(3)), and also permits individual States to opt their citizens out of the bankruptcy exemption scheme entirely, *see* 11 U.S.C. § 522(b)(2) (2008)).

distributed under the plan on account of each *allowed unsecured claim* is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date....

11 U.S.C. § 1325(a)(4) (2008) (emphasis supplied). This Section essentially requires that each allowed unsecured claim be paid an amount equivalent to that which it would receive as a distribution in a hypothetical Chapter 7 liquidation case.

## 2. Allowed *secured* claims.

The permitted treatment of "allowed *secured* claims" is more complex, and is set out at Section 1325(a)(5), to wit:

(a) Except as provided in subsection (b), the court shall confirm a plan if-

\* \* \* \*

(5) with respect to each *allowed secured claim* provided for by the plan-
(A) the holder of such claim has *accepted* the plan;
(B) (i) the plan provides that-
(I) the holder of such claim retain the lien securing such claim until the earlier of-

(aa) the payment of the underlying debt determined under nonbankruptcy law; or

(bb) discharge under section 1328; and

(II) if the case under this chapter is dismissed or converted without completion of the plan, such lien shall also be retained by such holder to the ex-

tent recognized by applicable non-bankruptcy law;

(ii) *the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim;* and

(iii) if-

(I) property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts; and

(II) the holder of the claim is secured by personal property, the amount of such payments shall not be less than an amount sufficient to provide to the holder of such claim adequate protection during the period of the plan; or

(C) *the debtor surrenders the property securing such claim to such holder* ....

11 U.S.C. § 1325(a)(5) (2008) (emphasis supplied). In sum, Code Section 1325(a)(5) provides that a debtor seeking confirmation of a Chapter 13 plan has three options for treatment of a creditor's *allowed secured claim:* (i) she may treat the claim and collateral in *any manner* she desires if she obtains the creditor's acceptance of the plan; (ii) she may retain possession of the collateral securing the claim if, *inter alia,* she makes specified payments equaling the *present value* of the secured claim (hereafter, "Cram–Down");[21] or (iii) she may simply *surrender* the subject collateral to the secured creditor (hereafter, "Surrender").

---

21. The United States Supreme Court has described the Cram–Down option as follows: "... the debtor is permitted to keep the property over the objection of the creditor; the creditor retains the lien securing the claim, *see* § 1325(a)(5)(B)(i), and the debtor is required to provide the creditor with payments, over the life of the plan, that will total the present value of the allowed secured claim, *i.e.* the present value of the collateral, *see* § 1325(a)(5)(B)(ii). The value of the collateral is governed by § 506(a) of the Code." *Rash,* 520 U.S. at 957, 117 S.Ct. 1879.

**D. The 910–Vehicle exception—the Hanging Paragraph.**

**1. Origin and purpose.**

As one might surmise, the Cram–Down treatment option was an anathema to secured lenders, and particularly to those who—like automobile finance companies—take security in rapidly depreciating collateral. Their particular concern was that opportunistic debtors might seek to restructure vehicle loans, *inter alia*, on advantageous new terms through the device of a strategically scheduled Chapter 13 bankruptcy filing—coinciding with a point in time when the loan-to-value ratio is at its greatest negative point, *i.e.* in the early years of ownership, when the loan principal had not yet been substantially amortized, yet the steepest "off the lot" vehicle depreciation had already occurred. Under such circumstances, debtors could have, in theory, employed Sections 506 and 1325 to reduce their indebtedness on loans collateralized by vehicles that they proposed to retain—by first, bifurcating a collateralized claim into allowed secured and allowed unsecured components under Section 506(a), and then utilizing the Cram–Down option of Section 1325(a)(5)(B) to satisfy the present value of *only* the allowed secured component of the creditor's entire claim. The allowed unsecured, "deficiency", component of the claim would then have been relegated to the relatively disadvantageous treatment required by Section 1325(a)(4).[22]

This Court takes judicial notice of the fact that concerns over Cram–Down served as part of the motivation for efforts, over the last decade, by consumer credit institutions and trade groups to bring creditor-friendly "reform" to the Bank-

ruptcy Code. In 2005, the lenders' lobby was finally successful in seeing many of its concerns addressed in the BAPCPA, including protection from Cram–Down in Chapter 13 cases for the claims of purchase-money lenders that are collateralized with rapidly-depreciating property such as recently-acquired motor vehicles, *i.e.* 910–Vehicles. This change was accomplished by appending the Hanging Paragraph to Section 1325(a). The Hanging Paragraph provides, in relevant part:

> *For purposes of paragraph (5) [of Section 1325(a)], section 506 shall not apply to a claim described in that paragraph* if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910–day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor. . . .

11 U.S.C. § 1325(a)(*) (2008) (emphasis supplied).

The Hanging Paragraph achieves its goal of limiting Cram–Down in Chapter 13 by preventing the *bifurcation* under Section 506(a) of, *inter alia*, 910–Vehicle Claims—*i.e.* claims arising from purchase-money consumer vehicle credit transactions originated within the 910 days preceding the filing of a bankruptcy case. *See* H.R. Rep. 109–31, at 17 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 103. The Hanging Paragraph was intended to *completely disable* Section 506's claim bifurcation mechanism in the context of 910–Vehicle Claims, creating somewhat of a legal fiction that such claims are *fully and perfectly secured* even if, in actuality, they are

---

**22.** Despite the theoretical possibility of this debtor strategy, it is important to note that any debtor agenda in Chapter 13 must be pursued in good faith. *See, e.g.,* 11 U.S.C. § 1325(a)(3).

under-collateralized. *See, e.g., Ballard,* 526 F.3d at 638; *Long,* 519 F.3d at 294. Therefore, a debtor who proposes in her Chapter 13 plan to *retain* a 910–Vehicle pursuant to 1325(a)(5)(B) may not engage in Cram–Down, but rather, in order to fully satisfy the 910–Vehicle Claim, must now pay the present value of the *entire, deemed unitary claim, not just the actually secured component* of that claim, as might otherwise have been characterized under Section 506. *See, e.g., id.*

### 2. Claim characterization for vehicle *surrender* under the Hanging Paragraph.

 The Debtor here does not attempt to *retain* her Vehicle, through Cram–Down or otherwise; rather, her plan provides for a *surrender* of the Vehicle under Section 1325(a)(5)(C) *in full satisfaction* of Banknorth's claim. Although courts agree that the Hanging Paragraph now prevents the bifurcation of a 910–Vehicle Claim where the subject vehicle is proposed to be *retained* by a debtor under the terms of Section 1325(a)(5)(B), they have, as noted in Section IV.A. of this Memorandum of Decision, reached differing conclusions concerning the effect of the Hanging Paragraph in cases, like this one, involving the *surrender* of a 910–Vehicle in proposed full satisfaction of the secured creditor's claim. This Court can make no principled distinction in the operation of the Hanging Paragraph between the contexts of vehicle *retention* and vehicle *surrender*, and thus, will consider a 910–Vehicle Claim *fully and perfectly secured in both retention and surrender contexts.*[23] This conclusion

is impelled by traditional maxims of statutory construction and long-standing principles of bankruptcy jurisprudence.

### a. The plain language of the Hanging Paragraph.

As made plain by its introductory language, the Hanging Paragraph was drafted "[f]or the purposes of paragraph [1325(a) ](5)" *generally,* not for application to any particular subparagraph thereof; and it operates upon any claim "described in that paragraph"—*i.e.* upon any *"allowed secured claim".* Fundamental tenets of statutory construction would thus compel the conclusion that the Hanging Paragraph's disabling of bifurcation should have general and uniform application to 910–Vehicle Claims in all treatment contexts. Logically then, to the extent the Hanging Paragraph renders a 910–Vehicle Claim *fully* secured if a debtor proposes to retain a 910–Vehicle under subparagraph (B) of Section 1325(a)(5), such claim should likewise be considered fully secured if that debtor proposes to surrender the vehicle under subparagraph (C) thereof. As the court in *Pinti* succinctly stated, "[i]t is not possible to read the Hanging Paragraph in such a way that it would function differently when applied to 910[-Vehicle] Claims under different subsections of Section 1325(a)(5)." 363 B.R. at 377.

On its face then, the Hanging Paragraph is no respecter of treatment—if a debtor has proposed to treat a 910–Vehicle Claim in *any* manner permitted by Section 1325(a)(5), she has treated, and thus *satisfied* for plan purposes, the *entire* 910–

---

**23.** It is certainly true that a fully secured characterization is not necessarily the default mode under federal bankruptcy law when Section 506 is disabled. Indeed, non-Section 506 bankruptcy law claim characterization could, in theory, render an under-collateralized claim either (i) fully secured; (ii) wholly

unsecured; or (iii) bifurcated, *see* fn. 25, *infra.* The fully secured option is compelled here because it is consistent, and the other two options are inconsistent, with the anti-bifurcation purposes of the Hanging Paragraph. *See, e.g.,* H.R. Rep. 109–31 at 17.

Vehicle Claim of the subject creditor—subject to discharge under Section 1328.[24] Therefore, under the literal import of Section 1325(a)(5) and the Hanging Paragraph, the "surrender" treatment option of Section 1325(a)(5)(C)—as proposed by the Debtor here—fully satisfies the *deemed* unitary claim of Banknorth, and renders unnecessary any separate treatment of an "unsecured" claim component representing any *actual* deficiency in the collateral for such claim. *See Ballard,* 526 F.3d at 638 ("Following this logic, surrender fully satisfies the claim and precludes an unsecured claim for a deficiency.").

### b. The viability of State Law claim characterization in bankruptcy.

Despite the clear general applicability of the Hanging Paragraph, Banknorth nonetheless urges this Court to follow the lead of the Deficiency Courts—which have drawn a distinction between *retention* and *surrender* in assessing the effect of the Hanging Paragraph upon a 910–Vehicle Claim. The Deficiency Courts do not directly assail the applicability of the Hanging Paragraph to the context of *surrender,* see, e.g., *Kenney,* 531 F.3d at 317 n. 5; most acknowledge that the Hanging Paragraph's plain language makes Section 506 inoperable in that context and thus that no

unsecured claim component of a 910–Vehicle Claim can be created under *bankruptcy* law.[25] Nevertheless those same courts require that a Chapter 13 plan proposing to *surrender* an under-secured 910–Vehicle also treat, pursuant to Section 1325(a)(4), any unsecured "deficiency" claim that might be determined pursuant to *State Law.*

■ In essence, most of the Deficiency Courts believe that Section 506's inoperability *vis-a-vis* 910–Vehicle Claims creates a legal vacuum that can and should be infiltrated by *State Law* concepts, at least in the surrender context. In truth though, as detailed in Section IV.B. of this Memorandum of Decision, State Law claim characterization concepts have no viability in bankruptcy unless Congress affirmatively gives them license to operate. Since nothing in the text or legislative history of the Hanging Paragraph evidences any Congressional desire to have State Law govern the characterization of 910–Vehicle Claims in the absence of Section 506 bifurcation, such characterization must be performed by federal bankruptcy law.

The principal basis for the Deficiency Courts' endorsement of State Law appears to be an erroneous belief that bankruptcy law incorporates a *presumption* in favor of

**24.** At least one court has placed some significance in the fact that Section 1325(a)(5)(C) does not explicitly mention "satisfaction". *See, e.g., Osborn,* 515 F.3d at 821–22. This observation is of no moment since the *introductory* language of Section 1325(a)(5)— *"with respect* to each allowed secured claim provided for by the plan" (emphasis supplied)—makes plain that surrender under subsection (C) constitutes fully satisfactory *treatment* of an allowed secured claim, not some independent affirmative action required for confirmation. Further, none of the other treatment terms of Section 1325(a) mention "satisfaction" either. That is because, under the Bankruptcy Code, the concept of *satisfaction* is ultimately dependent upon *discharge,*

not *treatment.* Namely, under Chapter 13 of the Bankruptcy Code, a claim is only fully satisfied when it has been *treated* in accordance with the Code, *see* section 1325(a), *and* the debtor has received a *discharge, see* Section 1328.

**25.** One Circuit Court of Appeals has dissented from the general Deficiency Court view—recognizing the appropriateness of a mandatory federal bankruptcy rule for claim characterization, but feeling compelled to fashion its own uniform federal *deficiency* rule for 910–Vehicle Claims applicable "until Congress can correct its *mistake* ...." *Long,* 519 F.3d at 288, 290, 296–298 (emphasis supplied).

the use of a State Law for the purpose of claim *characterization*—*i.e.* in the absence of explicit Bankruptcy Code displacement of State Law claim characterization schemes, their use should be permitted. Indeed, these courts believe that State Law claim bifurcation is the "default" mechanism of bankruptcy claim characterization when bifurcation under Section 506 is disabled, as is the case with 910–Vehicle Claims. The Deficiency Courts purport to glean this view from Supreme Court authority, represented by *e.g.*, *Butner* (to-wit: "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." 440 U.S. 48, 99 S.Ct. 914, 918, 59 L.Ed.2d 136), *Raleigh* (to-wit: "creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code." 120 S.Ct. at 1955), and *Travelers* (to-wit: "we generally presume that claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed." 127 S.Ct. at 1206). The Deficiency Courts read these Supreme Court authorities much too broadly, implying, without direct-

ly stating, that the presumptions they glean therefrom are constitutionally derived and compelled, rather than constituting merely a description of the role for State Law as affirmatively designed by Congress in the exercise of its prerogatives under the Bankruptcy Clause.

Technically speaking, *Butner* is a decision rendered under the former Bankruptcy Act, and the Bankruptcy Code has superseded its specific holding.[26] Nonetheless, even if *Butner* provides a valid rule of decision under the Bankruptcy Code, its citation in relation to the present question is inapt because it deals with the *nature and extent of property interests*, not with the *characterization of claims* as secured and/or unsecured.[27] *Cf. United States v. Security Indus. Bank*, 459 U.S. 70, 75, 103 S.Ct. 407, 411, 74 L.Ed.2d 235 (1982) ("... our cases recognize, as did the common law, that the contractual right of a secured creditor to obtain repayment of his debt may be quite different in legal contemplation from the property right of the same creditor in the collateral."). More fundamentally however, as detailed in Section IV.B. of

---

**26.** Nonetheless, *Butner's* core principles remain "good law", as it has been re-articulated by the High Court since the advent of the Bankruptcy Code. *See, e.g.*, *Barnhill v. Johnson*, 503 U.S. 393, 398, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992).

**27.** This is not to say that State Law *property* concepts have no role to play in bankruptcy claim characterization, just not the presumptive and plenary one that the Deficiency Courts ascribe to them. For instance, when Section 506 is operable, the first analytical step in the claim characterization process is a determination of the "debtor's interest" in a given item of collateral property. Consistent with the principles of *Butner*, this definitional function is presumptively exercised by reference to State Law. Likewise, the second analytical step under Section 506—determination of the *"creditor's* interest" in the debtor's in-

terest—is also the presumptive province of State Law. However, the *ultimate* step in Section 506 characterization—*valuation* of the "creditor's interest"—is not addressed by *Butner*, and constitutes the exclusive province of federal bankruptcy law. *Cf., e.g.*, *Barnhill*, 503 U.S. at 397–98, 112 S.Ct. at 1389 (stating, in the context of Code Section 547, that references to "property" and "interests in property" in the definition of "transfer" are "creatures of state law", yet recognizing that such concepts are subsidiary to the ultimate determination of a "transfer"—which is a term governed by federal law, as defined in the Bankruptcy Code). In other words, State Law's limited role under Section 506 precedes the actual bifurcation of claims through the process of valuation under uniform, Title 11, law.

this Memorandum of Decision, *Butner* is consistent with one of the ways in which Congress has traditionally permitted State Law to function within the fabric of federal bankruptcy law; namely, to define the *pre-existing, i.e.* pre-bankruptcy, rights of the parties to a bankruptcy case. Since *Butner* recognizes that this role for State Law property concepts is exercised at the pleasure of Congress, and is not constitutionally compelled, *see Butner,* 99 S.Ct. at 918, it is wholly consistent with a position that views bankruptcy administrative concepts, such as claim characterization, as remaining within the exclusive province of federal bankruptcy law.

*Raleigh* and *Travelers* also provide no direct support for a State Law presumption in claim characterization. Instead, their holdings are wholly consistent with the plenary role of federal bankruptcy law in the area of claim determination. As with *Butner* in the realm of property interests, neither *Raleigh* nor *Travelers* sets out a *constitutional* presumption of State Law utilization. Rather, they simply illustrate one manner in which Congress has chosen to admit State Law principles into the sphere of its exclusive jurisdiction under the Bankruptcy and Supremacy Clauses. Namely, these decisions highlight the license Congress has granted to State Law to define and describe the *pre-existing, i.e.* pre-bankruptcy, rights of the parties to a bankruptcy case, specifically the "enforceability" of claims under Section 502. Further, the Deficiency Courts' reliance on *Raleigh* and *Travelers* evidences an inappropriate blurring of the separate concepts of claim *allowance* and *characterization* under Title 11.[28] *Allowance* is not at issue in the case at bar; it is undisputed that Banknorth possesses an *allowed* claim un-

der Section 502 that includes the full amount of any deficiency claim that it might otherwise possess under State Law. The issue before the Court, rather, is ultimately one of claim *characterization,* which is not addressed by *Raleigh* or *Travelers.* For example, the holding of *Travelers*—"... claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed"—is at base no more than an accurate description of the mechanics of Code Section 502(b)—which makes claims that are "enforceable" under State Law, *see* Section 502(b)(1), *allowable* in bankruptcy unless they are explicitly excluded by one of the subsections of Section 502(b).

### E. Other considerations supporting a full-satisfaction vehicle surrender.

#### 1. Implications of "anti-bifurcation" purpose of the Hanging Paragraph.

In view of the plain meaning of the Hanging Paragraph, and the demonstrated absence of constitutional support for a presumption of State Law claim characterization, there exists no persuasive basis for this Court, or any other court of bankruptcy jurisdiction, to undermine the primacy of federal bankruptcy law, and upset the delicate balance of federalism struck by Congress, by supplying disparate characterizations of 910–Vehicle Claims in the contexts of retention and surrender. This conclusion is only strengthened when one considers more carefully the implications that flow from the Deficiency Courts' approach in light of the clear legislative objective of the Hanging Paragraph.

It is manifest to this Court that the goal of Congress with respect to 910–Vehicle

---

28. For instance, *Ballard* argues for the viability of a 910–Vehicle deficiency claim under State Law by observing that "... nothing in

§ 502, the provision governing the *allowance* of claims, excludes or limits such a claim." (emphasis supplied).

Claims was to prevent *bifurcation*, plain and simple. The evident intention was to bar bifurcation in a *comprehensive* fashion. It would not have mattered to the drafters whether bifurcation occurred under Section 506 or State Law; any manner of bifurcation of 910–Vehicle Claims was plainly an anathema to the animating purpose of the Hanging Paragraph—precluding Cram–Down. This is the clear import of the legislative history. *See* H.R. Rep. 109–31 at 17. It is somewhat bewildering then, that the Deficiency Courts nonetheless construe the Hanging Paragraph to endorse a system of 910–Vehicle Claim bifurcation, albeit only in the surrender context.

### a. State Law inoperative for claim characterization.

The express terms of the Hanging Paragraph, viewed in light of Congress' desire for a comprehensive prohibition on bifurcation, also lead to an important observation. If Congress had understood there to be a viable State Law bifurcation scheme that could operate within the fabric of federal bankruptcy law, it would certainly have acted to disable that scheme as well, by adding "State Law", or words to that effect, to the Hanging Paragraph's prohibitory language with respect to Section 506. Hence, Congress' declination to expressly disable State Law bifurcation mechanisms in the Hanging Paragraph speaks volumes about Congress' own belief in the viability of State Law claim characterization in bankruptcy.

### b. Deficiency Courts' inconsistent approach.

The Deficiency Court view also appears to "prove too much". If, as the Deficiency Courts reason, the Hanging Paragraph's disabling of Section 506 creates a default to State Law bifurcation in the surrender context, then why not also in the retention context? In other words, by what theory can a court permit 910–Vehicle Claimants to have their claims bifurcated under State Law in the *surrender* context, but not also permit *debtors* to do likewise in the *retention* context? [29] In the context of vehicle *retention*, this Court would necessarily reject the admission of a State Law system of bifurcation because that would permit Cram–Down of 910–Vehicle Claims to be revived through a "back door", and thereby defeat the prime legislative objective of the Hanging Paragraph. Consequently, because the Hanging Paragraph, by its terms, applies equally to retention and surrender, a court must question by what neutral principle a default system of State Law claim characterization can bifurcate claims only in the context of vehicle *surrender*?

None of the Deficiency Courts answer this question directly. However, two potential approaches explaining the Deficiency Courts' seemingly inconsistent construction of the Hanging Paragraph are suggested. The first, revealed only in *Osborn*, 515 F.3d at 821, 822, suggests a belief that State Law claim characterization applies in all contexts when 506 is disabled; and that those State Law concepts produce disparate results in the re-

---

**29.** Some courts may be tempted to deny debtors standing to access State Law bifurcation (*i.e.* deficiency) schemes in the context of retention, on the assumption that they are exclusively creditor entitlements. Yet this supposition is inaccurate. The various elements of State Law mechanisms for the determination of unsecured deficiency claims—e.g., scope, notice, procedures and standards—are not the exclusive entitlements of creditors or debtors. Instead, they represent an individual jurisdiction's unique balancing of the interests of debtors and creditors to arrive at a legal framework that best serves that jurisdiction's public policy.

tention and surrender contexts. The second suggestion, implicit in nearly all the Deficiency Court opinions, is that Congress *specifically intended* the Hanging Paragraph to produce different effects in the retention and surrender contexts. *See, e.g., Long, supra,* at 294. Neither of these justifications provides a satisfactory basis for disparate characterization of 910-Vehicle Claims in the retention and surrender treatment contexts.

### i. *Osborn*—asymmetrical characterization under State Law?

The first justification essentially suggests that (i) State Law fills the claim characterization vacuum created by the Hanging Paragraph's disabling of Section 506; (ii) such State Law applies in both retention and surrender contexts; and (iii) such State Law has an asymmetrical effect—characterizing claims on *surrendered* vehicles through "forced sale" bifurcation, and characterizing all claims on *retained* vehicles as fully secured—because that is the effect under State Law. This view fails on multiple levels of analysis. First and most fundamentally, for the reasons discussed at length in this Memorandum of Decision, State Law has no role to play in the characterization of claims in bankruptcy unless Congress affirmatively grants it license to do so. Thus, because there is no evidence in the legislative record that Congress intended State Law to operate in the void created by the Hanging Paragraph's disabling of Section 506, the mode of characterization that must apply is supplied by non-Section 506 federal bankruptcy law.

Second, even if State Law could apply in theory, it is not well suited to a characterization function for the purposes of Chapter 13 of the Bankruptcy Code. State Law is generally not concerned with the characterization of claims as secured and/or unsecured. Although non-bankruptcy courts may have rare occasion to issue declaratory relief as to the character of claims under State Law, in general, State Law does not perform a characterization function that is compatible with the needs of Chapter 13 of the Bankruptcy Code. In addition, although Article 9 of the Uniform Commercial Code has gone a long way toward standardizing secured transactions across the several States, there is still a lack of uniformity in State Law in this area, particularly when the subject collateral is a motor vehicle. If bankruptcy courts were required to characterize claims under State law, choice of law issues alone would unnecessarily burden the bankruptcy process, to say nothing of the challenges in actually determining and applying the law of multiple jurisdictions.

Outside of bankruptcy, under *most* State Law, when a debtor is retaining a liened vehicle, there is no general need for a characterization of the claim; absent an agreement to the contrary, the debtor pays the full amount of the debt (even if more than the value of the vehicle) lest it be repossessed. Does that mean that a retained vehicle claim is always properly characterized as *fully* secured under State Law? *Osborn* seems to suggest so, 515 F.3d at 821, although this Court is not convinced. If, and only if, the debt is not paid, the claim is eventually characterized through a valuation that occurs if the creditor seeks a deficiency judgment. Generally, that valuation is obtained through a "forced" sale of the vehicle.

Putting aside any distinction between the State Law concept of repossession and the bankruptcy concept of surrender, what is most troubling about the use of a forced sale under State Law to characterize claims in bankruptcy is the timing of the relevant events. A forced sale under State Law necessarily occurs only after the creditor obtains possession of the sub-

ject vehicle. Under Chapter 13, even if a debtor proposes to surrender a vehicle in her Chapter 13 plan, she is not, subject to certain creditor rights,[30] required to part with possession until actual confirmation of her plan. Because claim characterization is a prerequisite to confirmation—so that compliance with Section 1325(a)(4) and (5), *inter alia,* can be accurately assessed by the Court—there is a potential temporal obstacle to using State Law deficiency methodologies for purposes of Chapter 13 claim characterizations. Even if procedural devices could be implemented to integrate the State Law and Chapter 13 bankruptcy schemes, intolerable delays and inefficiencies would frustrate a bankruptcy process that was designed by Congress to be a *summary proceeding.*

Given the foregoing conceptual and practical difficulties in the application of State Law for the characterization of claims in bankruptcy, this Court concludes that use of State Law for such characterization is inconsistent with the intended scheme of Chapter 13 cases. Stated in constitutional terms, assuming for the moment that State Law is not "field preempted", given the specific nature of State Law, it would certainly be "conflict preempted" in the area of claim characterization for "stand[ing] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines, supra,* 312 U.S. at 67, 61 S.Ct. at 404.

### ii. Specifically-intended disparity?

The other justification for allowing bifurcation for surrender, but not for retention, is the Deficiency Courts' suggestion that Congress *specifically intended* the best possible result for secured creditors under *each* of the treatment options of Section 1325(a)(5), even if those results required the application of disparate claim charac-

terization rules. This suggestion is completely untenable on the existing legislative record.

First, as noted above, absolutely *nothing* in the plain language of the Hanging Paragraph evidences an intended Congressional distinction between retention and surrender. And although the import of the literal language of a statute can be subordinated in extraordinary instances in which that language produces a result that is "demonstrably at odds with the intentions of its drafters", *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982), that extraordinary circumstance plainly does not exist here. In fact, despite the suggestions of some of the Deficiency Courts, *e.g., Long,* 519 F.3d at 294, there is absolutely no enlightening legislative history that might reveal the purpose, if any, of the Hanging Paragraph vis-a-vis the *surrender* treatment option of Section 1325(a)(5).

The following comments from the House Report, referenced *supra,* address the Hanging Paragraph:

> *Protections for Secured Creditors.* S. 256's protections for secured creditors include a *prohibition against bifurcating* a secured debt incurred within the 910–day period preceding the filing of a bankruptcy case if the debt is secured by a purchase money security interest in a motor vehicle acquired for the debtor's personal use.

H.R. Rep. 109–31 at 17 (emphasis supplied). While describing a general preclusion of bifurcation, this legislative description makes no mention of a possible distinction between retention and surrender. The House Report further provides—

---

**30.** *See, e.g.,* 11 U.S.C. § 362(d) (relief from automatic stay of Section 362(a)).

Sec. 306. *Giving Secured Creditors Fair Treatment in Chapter 13.* Subsection (a) of section 306 of the Act amends Bankruptcy Code section 1325(a)(5)(B)(i) to require-as a condition of confirmation-that a chapter 13 plan provide that a secured creditor retain its lien until the earlier of when the underlying debt is paid or the debtor receives a discharge. If the case is dismissed or converted prior to completion of the plan, the secured creditor is entitled to retain its lien to the extent recognized under applicable nonbankruptcy law.

Section 306(b) adds a new paragraph to section 1325(a) of the Bankruptcy Code specifying that Bankruptcy Code section 506 does not apply to a debt incurred within the two and one-half year period preceding the filing of the bankruptcy case if the debt is secured by a purchase money security interest in a motor vehicle acquired for the personal use of the debtor within 910 days preceding the filing of the petition.

*Id.* at 71–72. As other courts have noted, these statements of congressional intent basically mirror the statutory language, with no further clarification. *Ezell,* 338 B.R. at 341. Several of the Deficiency Courts have tried to divine some intention from the title of Section 306 of the BAPCPA, namely, *"Giving Secured Creditors Fair Treatment in Chapter 13 ... Restoring the Foundation for Secured Credit."* *E.g., Long,* 519 F.3d at 294 (citing favorably to *In re Duke,* 345 B.R. 806, 809 (Bankr.W.D.Ky.2006)). Yet, "fair" treatment in a policy-making environment is rarely the same thing as *exclusively ad-*

vantageous treatment. *See In re Turkowitch,* 355 B.R. 120, 126 (Bankr.E.D.Wis. 2006). Congress can, and does, attempt to create fairness by balancing the impact of its legislation. This argument also belies a generalized, but false, belief among the Deficiency Courts that if Congress intended good things for secured lenders in *one* respect, it must have intended the best outcome for them in *all* respects. This line of reasoning is incongruous, and offensive to Congress, since it assumes that Congress was incapable of any independent role in the legislative process, and was but a scrivener for the wishes of the lender lobby. The long and tortured path of BAPCPA is refutation enough of that argument.

Accordingly, all that one can conclude with any degree of confidence from the legislative record is that in calculating the effect of the Hanging Paragraph, Congress did *not* intend to admit an alternative State Law system of claim characterization that is inconsistent with traditional plenary federal bankruptcy jurisdiction over claim determinations, and ultimately undermines the animating purpose of the Hanging Paragraph. Congress' specific intentions, if any, with respect to the characterization of 910–Vehicle Claims in the context of *surrender* need not be identified for purposes of the matter at bar.[31]

### 2. Hazards of a result-driven approach.

The Deficiency Courts appear to have a fundamental philosophical concern with the natural and neutral effect of the Hanging Paragraph. The Deficiency Court opinions

---

**31.** In this Court's view it is quite possible that with respect to treatment of secured vehicle claims in Chapter 13, Congress consented to give the lender lobby its prime object—insulation from Cram–Down—while exacting some small measure of concession—*i.e.* loss of an unsecured deficiency claim in the context of

surrender—so as to maintain a sense of symmetry and consistency within the law. It is also plausible, frankly, that Congress did not specifically consider the *surrender* context at *all,* and that *surrender* simply got "taken along for the ride" on *retention's* "escape" from Section 506.

convey a result-driven approach to statutory construction. For instance, these courts express disfavor for the fact that bankruptcy law can limit *in bankruptcy* the contractual and statutory deficiency rights of secured creditors, *see, e.g., Long,* 519 F.3d at 295; [32] *Wright,* 492 F.3d at 832,[33] without a scintilla of evidence that Congress ever considered or weighed that or any similar concerns in the legislative process that produced the Hanging Paragraph. The Deficiency Courts also take some pains to sketch out certain hypothetical scenarios that purport to demonstrate either an unfairness or absurdity inherent in a Full–Satisfaction construction of the Hanging Paragraph. *See, e.g., Long,* 519 F.3d at 295; [34] *Wright,* 492 F.3d at 832.[35] Yet while these illustrations are admittedly engaging, and perhaps even shocking to a lay audience, they are not extraordinary in the context of bankruptcy jurisprudence, and in the absence of any clear evidence of the mind of Congress on the effect of surrender, they are not appropriate grounds for consideration in the matter *sub judice.*

■ The very heart of the bankruptcy laws is the financial relief of debtors through the *modification* of pre-bankruptcy, *i.e.* State Law, rights of parties within debtor-creditor relationships. The fact that there are in that adjustment process monetary winners and losers, as well as frustrated contractual expectations, is part and parcel of our national bankruptcy system. Likewise, the fact that bankruptcy law may result in profoundly disparate effects on either side of a temporal line of legal demarcation is simply the common and necessary effect of Congressional legislative activity under the Bankruptcy Clause of the United States Constitution. Such effects are legion.[36] The only possible limitations on the power of Congress under the Bankruptcy Clause to modify pre-bankruptcy rights and obligations are *other constitutional* provisions that may specifically limit the power of Congress with respect to creditors' claims and other private rights. *See, e.g.,* U.S. Const., Art. I, § 9, cl. 3 ("No ... ex post facto Law shall be passed."); Amend. V ("No person shall be ... deprived of ... property without due process of law...."). Accordingly, unless a court is undertaking a *constitutional* analysis of the application of the

---

**32.** To-wit: "Eliminating a deficiency judgment ... would give to debtors the power to wipe out a legitimately incurred debt entirely."

**33.** To-wit: "[The debtors] do not argue that non-recourse lending is common in consumer transactions, and it is hard to imagine that Congress took such an indirect means of making non-recourse lending compulsory."

**34.** To-wit: "The consumer would have an incentive to buy an expensive new car, drive it for awhile, file for Chapter 13, surrender the car, and wipe out the debt. Car dealers and finance companies would have to figure these new uncertainties into the price or financing costs of each car sold."

**35.** To-wit: "If the [debtors] had surrendered their car the day before filing for bankruptcy, the creditor would have been entitled to treat any shortfall in the collateral's value as an unsecured debt. It is hard to see why the result should be different if the debtors surrender the collateral the day after filing for bankruptcy when, given the hanging paragraph, no operative section of the Bankruptcy Code contains any contrary rule."

**36.** *See, e.g.,* 11 U.S.C. § 541(a)(5)(A) (debtor must account to bankruptcy trustee for inheritance due from decedent's estate of an individual who dies 179 days following the filing of the bankruptcy petition, while decedent's passing on the 181st day post-petition would permit debtor to retain inheritance in full); 547(b)(4)(A) (creditor receiving payment from debtor 89 days pre-petition must return payment as preferential, while similarly-situated creditor receiving payment 91 days pre-petition may retain funds).

Hanging Paragraph to surrender, then it would seem inappropriate to allow considerations of economic impact to weigh in an analysis of the intent and propriety of Congress' drafting of the Bankruptcy Code.[37] In sum, in dealing with the admittedly difficult task of knitting the Hanging Paragraph into the larger fabric of Title 11 law, courts would profit by reflection upon the wisdom of the Supreme Court in *Crooks v. Harrelson*, to-wit:

> Laws enacted with good intention, when put to the test, frequently, and to the surprise of the law maker himself, turn out to be mischievous, absurd or otherwise objectionable. But in such case the remedy lies with the law making authority, and not with the courts.

282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930).

### F. Alternative Basis for Ruling.

▆▆▆ As this Court found at Paragraph III.F. of this Memorandum of Decision, Banknorth has presented a Proof of Claim in this case that asserts the *entire* amount of its claim as *secured*. Therefore, although Banknorth is indisputably the holder of a 910–Vehicle Claim its voluntary election to present its claim as a unitary secured claim, rather than a bifurcated claim with secured and unsecured components, estops Banknorth from now objecting to the Debtor's Plan on the basis of the plan's failure to treat a portion of its claim as unsecured.

## V. CONCLUSION.

For the foregoing reasons, the objection of Banknorth to the confirmation of the Debtor's proposed Chapter 13 plan will be **OVERRULED,** and that plan will be **CONFIRMED** by separate order.

---

37. For the most part, the Deficiency Courts have shied away from a constitutional assault on the Hanging Paragraph as applied to 910–Vehicle surrender. *Long* is the singular Deficiency Court to allude to Constitutional limitations, but in doing so made a fundamental error. 519 F.3d at 291 ("Wiping out the deficiency altogether undermines reasonable obligations created by the contract between the parties. These contractual obligations are referred to in our Constitution, *see* U.S. Const. Art. I, § 10, cl. 1 ...."). In actuality, § 10 of Article 1 addresses only limitations on state legislatures, not Congress. In this respect it is noteworthy to compare § 10, cl. 1 (prohibiting *states* from passing "any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts") with § 8, cl. 3 (prohibiting *Congress* from passing "Bill[s] of Attainder [and] ... ex post facto Law[s]" only). *See, e.g., Hanover National Bank v. Moyses*, 186 U.S. 181, 188, 22 S.Ct. 857, 860, 46 L.Ed. 1113 (1902) ("The subject of 'bankruptcies' includes the power to discharge the debtor from his contracts and legal liabilities, as well as to distribute his property. The grant to Congress involves the power to impair the obligation of contracts, and this the states were forbidden to do.")